THE NEW YORK, LAKE ERIE AND WESTERN RAILROAD COMPANY v. HUGHES, COLLECTOR, AND YARD, COMMISSIONER.

1. Under the third and fourth sections of the Riparian act of March 31st, 1869, (*Rev., p.* 982,) the Hoboken Land and Improvement Company and its assigns may secure from the state a conveyance in fee of the lands naturally under water, lying in front of the lands owned by such corporation or its assigns, on paying therefor to the state $50 per foot measured upon the bulkhead line in front of the lands included in the conveyance.

2.  The privilege of securing such a conveyance must be regarded as enhancing the value of the land, to the ownership of which the privilege attaches, for the purpose of taxation.

On *certiorari.*   In matter of taxation.

Argued at November Term, 1883, before Justices KNAPP, DIXON and MAGIE.

For the prosecutor, *Cortlandt Parker.*

For the defendants, *Peter Bentley.*

The opinion of the court was delivered by

DIXON, J.   In accordance with the decision of the Court of Errors in this cause, reported in 14 *Vroom* 632, it was referred to a commissioner to ascertain and report the true value of ten and four-tenths acres of land, lying at Weehawken, along the tide-waters of the Hudson river, taking into consideration the enhancement of value, if any, by reason of the land's frontage on the water, and of the privileges arising from its location, to the end that the tax therefor against the prosecutors, for the year 1879, might be adjusted.   The commissioner reports the value of the land, exclusive of water privileges, as $171,600 in 1882, and thinking that these privileges consist of a " pier right " or privilege of building and using piers in front of the land, he reports that right as worth, in 1882, $250 per foot of frontage measured upon the bulkhead line or line of solid filling established by the riparian commissioners and extending twelve hundred and eleven feet in front of this property, thus making $302,750 as the value of the pier right, and $474,350 as the value of the land with its privileges in 1882.   This he reduces to $407,150.43, as representing the value in 1879.   Adding the value of the improvements at that time, $197,091, he reports $604,241.43 as the taxable value.

The company takes exception to the inclusion of the pier

right as an element of value, and the municipality complains of the exclusion of a privilege of reclaiming twenty-two and thirty-eight hundredths acres of land under water, lying in front of these ten and four-tenths acres, and within the bulkhead line, which privilege, it is claimed, belongs to the prosecutor as owner of this upland, and in 1879 was worth nearly $10,000 per acre.

These contentions present the question for decision.

The prosecutor has title to this upland as the grantee of Jay Gould, who was the grantee of the " Weehawken Docks," which was the grantee of the "Hoboken Land and Improvement Company." The last-named company became the owner of the natural upland along this portion of the Hudson river, and by its charter had given to it power to purchase, fill up, occupy, possess and enjoy all land covered with water fronting and adjoining the lands owned by it. Being such owner, it conveyed the property now vested in the prosecutor, viz., a tract of land bounded on the west by a defined line upon the upland, two thousand feet in length, and on the north and south by lines drawn easterly at right angles from the extremities of said first line to the middle of the Hudson river, together with all the land under water in said river easterly and in front of said upland and within the said northerly and southerly lines, as far easterly as the right and title of the grantor to the said land under water extended, and all the water rights and other rights and privileges of the said grantor, whether derived by legislative act or otherwise, to reclaim, improve and appropriate to their own use the said land under water, within said lines, to the middle of the Hudson river. These boundaries include the ten and four-tenths acres of land above water and the twenty-two and thirty-eight hundredths acres under water.

Whether the power given to the Hoboken Land and Improvement Company by its charter to purchase, fill up, occupy, possess and enjoy the land covered with water in front of land owned by it is to be considered as having conferred upon the company merely capacity to exercise the ordinary privilege

of riparian owners to reclaim the shore in front of them, and so acquire title to it, (*Stevens* v. *Paterson and Newark R. R. Co.*, 5 *Vroom* 532,) or as a wider license to extend its reclamation and appropriation below low-water mark as far as the interests of navigation would permit, I cannot and need not now decide.   But this seems clear—that the power thus given brought the company within the class of corporations mentioned in the third and fourth sections of the Riparian act of March 31st, 1869, (*Rev.*, *p.* 982,) by which it was enacted that any corporation which has power given directly by legislative act to purchase, fill up, occupy, possess and enjoy lands covered with water, fronting and adjoining lands owned by it on the tide-waters of the Hudson river, or the assigns of any such corporation, may secure from the State of New Jersey a conveyance in fee of the lands naturally under water, whether then filled in or not, lying in front of the lands of such corporation or its assigns, on paying therefor to the state $50 per foot, measured upon the bulkhead line in front of the lands included in the conveyance, and that the conveyance shall pass not merely the title to the land described in it, but also the right to exclude the tide-water from such land as far out as the exterior bulkhead line, and to appropriate the land to private uses, and also the right to the perquisites of wharfage and other like profits, tolls and charges.   Now, the power, upon the grant of which by direct act of the legislature this right of purchasing the state's title is made to depend, is the very power which the Hoboken Land and Improvement Company received by its charter, and consequently the company's assignee, the prosecutor, became entitled, as owner of the upland, to the conveyance mentioned in the statute on payment of the stipulated price.   On receiving such conveyance, the prosecutor will be owner of the twenty-two and thirty-eight hundredths acres of land now under water, with the right of reclaiming it, and also of what is called the "pier right" along twelve hundred and eleven feet of the bulkhead line.   This right of purchase is, therefore, in my judgment, the privilege whose value should be considered as entering

into the taxable value of the ten and four-tenths acres of upland assessed against the prosecutor.

The value of the right is readily ascertainable from the evidence of Mr. Dod, the only witness sworn before the commissioner on that subject. The value of the land under water was fixed by him at $10,000 per acre in 1882, being $223,-800 for twenty-two and thirty-eight hundredths acres, and the value in 1879 at a small percentage below that sum—say $192,095. The commissioner correctly reports the value of the pier right at $259,860.43, thus making the value of both $451,955.43. Deduct from this what it will cost the prosecutor to perfect his title, $50 per foot for twelve hundred and eleven feet, viz., $60,550, and the balance, $391,405.43, represents the value in 1879 of the privileges which the prosecutor had appurtenant to its ownership of the ten and four-tenths acres. Adding the value of these ten and four-tenths acres and the improvements thereon, reported by the commissioner as $344,381, and we have, as the assessable value of the whole in 1879, the sum of $735,786.43.

A few words as to the position taken by counsel for the prosecutor, that the pier right belongs to the natural upland, and therefore cannot be appurtenant to the prosecutor's upland, which, he says, is all artificial. I have been unable to find, in the papers submitted, evidence that all of this upland is artificial. The description in the deeds under which the prosecutor claims, seems to indicate that the entire westerly boundary of the land is on the natural ground, and the only contradictory evidence is the testimony of Mr. Chanute, the engineer, and the map, which show that about seven hundred and thirty feet of that boundary lie east of the water's edge. The rest of the two thousand feet still appears to have been not below the water line, and in front of this portion is the whole tract in controversy situate. But if the fact be as stated, nevertheless I think the pier right must be regarded as appurtenant to that land which actually adjoins the water, whether it be natural or artificial. The right is one which can be enjoyed only where the means of passing from the

water to the land are provided, and this cannot possibly be inside of the external line of solid ground. There can be no doubt that the description in the deed was intended to embrace such a right, as well as all other rights made available by reason of the adjacency of the water, and, in my judgment, it belongs to the prosecutor.